Received and Filed
08-2465 & 08-2466
09/22/08
Marcia M. Waldron,
Clerk

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

NOS. 08-2465 and 08-2466

---

SANDRA CORTEZ,

Appellant / Cross-Appellee,

v.

TRANS UNION, LLC,

Appellee / Cross-Appellant

---

On Appeal From The United States District Court
For The Eastern District of Pennsylvania
In Civil Action No. 05-5684

---

BRIEF AND APPENIDX VOLUME I (PAGES A1-A6)
OF APPELLANT / CROSS-APPELLEE

---

James A. Francis
John Soumilas
FRANCIS & MAILMAN, P.C.
Land Title Building, 19th Floor
100 South Broad Street
Philadelphia, PA 19110
(215) 735-8600
Attorneys for Appellant / Cross-Appellee

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. iii

I.    STATEMENT OF THE CASE ............................................................... 1

II.   STATEMENT OF JURISDICTION ....................................................... 3

III.  STATEMENT OF ISSUES PRESENTED ............................................ 3

IV.   STANDARD OF REVIEW.................................................................... 3

V.    FACTS .................................................................................................. 4

      A.  Ms. Cortez's Humiliating And Scary Ordeal Of Learning That TU
          Has Her Marked As A Criminal On The Government's OFAC
          List ................................................................................................ 4

      B.  TU's Repeated Failures To Disclose The Truth To Ms. Cortez
          That It Was Representing Her As An OFAC Criminal, And TU's
          Refusal To Investigate Ms. Cortez's Disputes ................................. 7

      C.  TU's Refusal To Even Recognize -- Or Note -- Ms. Cortez's
          Dispute In Subsequent Reports.......................................................... 10

      D.  Continuing Defamation, Anxiety and Worry .................................... 11

      E.  TU's Policy Determinations Concerning OFAC Alerts And Its
          Conscious Refusal To Investigate Disputes ..................................... 12

      F.  TU Falsely Blames The Government For Its Error............................ 17

      G.  TU's Long-Standing "Mixed File" Problem And Conscious
          Disregard Of Consumer Rights ......................................................... 19

      H.  The Jury's Punitive Damages Award Is Less Than 1/10 Of 1% Of
          TU's Net Worth ................................................................................. 21

VI.   PROCEDURAL BACKGROUND ........................................................ 21

VII.    ARGUMENT ......................................................................................... 24

        A. SUMMARY OF ARGUMENT ...................................................... 24

        B. ARGUMENT ................................................................................. 24

VIII.   CONCLUSION ..................................................................................... 33

COMBINED CERTIFICATIONS ..................................................................... 34

        • CERTIFICATIONS OF BAR MEMBERSHIP ............................. 34

        • CERTIFICATE OF WORD COUNT ............................................. 36

        • CERTIFICATE OF SERVICE ....................................................... 37

        • CERTIFICATE OF BRIEF TEXT .................................................. 38

        • CERTIFICATION OF VIRUS CHECK ......................................... 39

# TABLE OF AUTHORITIES

## CASES

*Berger v. Colon,*
215 F.3d 1311 (1st Cir. 2000) .................................................................................25

*CGB Occupational Therapy, Inc. v. RHA Health Services,*
499 F.3d 184 (3d Cir. 2007) ...................................................................................31

*Demeretz v. Daniels Motor Freight, Inc.,*
307 F.2d 469 (3d Cir. 1962) ............................................................ 23, 24, 26, 27

*Donovan v. Penn Shipping Co., Inc.*,
429 U.S. 648 (1997) ...............................................................................................30

*Dow v. Baird*,
389 F.2d 882 (10th Cir. 1968) ...............................................................................27

*Farrber v. Massillon Bd. of Educ.*,
917 F.2d 1391 (6th Cir. 1990) ...............................................................................31

*Gasoline Products Co. v. Champlin Refining Co.,*
283 U.S. 494 (1931) ...............................................................................................25

*Honeywell, Inc. v. American Standards Testing Bureau, Inc.*,
851 F.2d 652 (3d Cir. 1988) .....................................................................................3

*Kelly v. Moore,*
376 F.3d 481 (5th Cir. 2004) .......................................................................... 25, 27

*Lightning Lube, Inc. v. Witco Corp.*,
4 F.3d 1153 (3d Cir. 1993) .......................................................................................3

*O'Gilvie v. International Playtex, Inc.*,
821 F.2d 1438 (10th Cir. 1987) .............................................................................31

*Phillips v. Negley,*
117 U.S. 665, 6 S.Ct. 901, 29 L.Ed. 1013 (1886) ................................................26

*Rode v. Dellarciprete*,
    892 F.2d 1177 (3d Cir. 1990) ..................................................................................32

*Snellman v. Ricoh Co., Ltd.*,
    836 F.2d 528 (C.A. Fed. 1987)................................................................................25

*Vizzini v. Ford Motor Co.*,
    569 F.2d 754 (3d Cir. 1977) ...................................................................................25

## STATUTES

15 U.S.C. § 1681 - 1681x ............................................................................................1

15 U.S.C. § 1681i......................................................................................................28

15 U.S.C. § 1681p........................................................................................................3

28 U.S.C. § 1291 ..........................................................................................................3

28 U.S.C. § 1331 ..........................................................................................................3

## RULES

Fed.R.App.P 28.1(b) ....................................................................................................1

Fed.R.Civ.P 59(b) ......................................................................................................25

Fed.R.Civ.P 59(d) .......................................................................... 3, 24, 25, 27, 28, 29

**UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

| | |
|---|---|
| **SANDRA CORTEZ** | ) |
| | ) |
| **Appellant/** | ) |
| **Cross-Appellee** | ) **Nos. 08-2465, 08-2466** |
| **vs.** | ) |
| | ) |
| **TRANS UNION, LLC** | ) |
| | ) |
| **Appellee/** | ) |
| **Cross-Appellant** | ) |
| | ) |

## I.  STATEMENT OF THE CASE

This is a consumer protection action that was tried in the Eastern
District of Pennsylvania before Judge Fullam and a jury between April 23
and 26, 2007.  It involves claims under the Fair Credit Reporting Act
("FCRA"), 15 U.S.C. §§ 1681 – 1681x. [1]

Appellant/Cross-Appellee Sandra Cortez brought this action because
TU, a national consumer reporting agency, had been selling credit reports
about her with a criminal alert on them -- labeling Ms. Cortez as a 35-year-

---

[1]     Trans Union, LLC ("TU") was first to file its notice of appeal on May
16, 2008 (A 3) (E.D. Pa. Docket 78) and Ms. Cortez followed (A 5) (E.D.
Pa. Docket 79).   By rule, the Clerk of the Third Circuit assigned Ms.
Cortez's cross-appeal a lower appellate docket number (08-2465) and TU's
appeal a higher number (08-2466).   (Fed. R. App. P. 28.1(b)).   Thus, Ms.
Cortez is Appellant/Cross-Appellee herein.

old Columbian drug-trafficker, and warning its customers against doing any business with her. The criminal alert falsely labeled Ms. Cortez as a wanted criminal on the Department of Treasury's Office of Foreign Asset Control ("OFAC") list. On one occasion, Ms. Cortez was advised at a car dealership that the FBI would be coming to arrest her because of TU's OFAC criminal alert, and was detained there for hours.

For at least two years, TU knew that Ms. Cortez was not in her 30s (she is over 60 years old), not Columbian, not a drug-trafficker, and also not on the OFAC list. TU knew that it was mixing up Appellant/Cross-Appellee with a foreign national named Sandra Cortes Quintero, and that it has a corporate-wide problem of mixing consumer files dating back to the 1990s. Yet despite Ms. Cortez's repeated and detailed disputes, it refused to stop its defamatory credit reporting.

The case proceeded to trial and a jury returned a verdict for Ms. Cortez in the amount of $800,000 -- $50,000 in actual damages and $750,000 in punitive damages. As more fully set forth below, Ms. Cortez now appeals the trial court's post-trial order (dated September 13, 2007) (A 823-29), which improperly reduced Ms. Cortez's punitive damages award as well as her counsel's fees and costs on condition of a new trial on damages which was not sought by TU.

2

## II.   STATEMENT OF JURISDICTION

This Court has appellate jurisdiction over the final order of the District Court pursuant to 28 U.S.C. § 1291. The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

## III.   STATEMENT OF ISSUES PRESENTED

1.  Did the District Court err in conditionally ordering a new trial on its own initiative and without providing Ms. Cortez with notice or an opportunity to be heard pursuant to Fed. R. Civ. P. 59(d)?

2.  Did the District Court err in reducing Ms. Cortez's attorney's fees and costs without any proper explanation and on condition that Ms. Cortez accept a reduced punitive damages award?

## IV.   STANDARD OF REVIEW

The standard of review on a motion for a new trial is "abuse of discretion unless the court's denial of the motion is based on application of a legal precept, in which case [the Appellate Court's] review is plenary." *Honeywell, Inc. v. American Standards Testing Bureau, Inc.*, 851 F.2d 652, 655 (3d Cir. 1988). The standard of review for a motion for judgment as a matter of law (related to issues that TU is expected to raise on appeal) is plenary. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993) ("We exercise plenary review of an order granting or denying a motion for judgment as a matter of law and apply the same standard as the district court.").

3

## I.    FACTS

### A.    Ms. Cortez's Humiliating And Scary Ordeal Of Learning That TU Has Her Marked As A Criminal On The Government's OFAC List

In March 2005, Ms. Cortez needed to buy a new car.    (A 79).

Because she did not have enough cash, she planned on getting a car loan,

checking her credit report on the Internet prior to physically going to an

Elway Subaru car dealership on March 30, 2005.    (A 81).    The TU credit

report that she saw on the Internet looked great, depicting her as a

responsible consumer who pays her bills on time and has an excellent credit

score.    (A 80-81).    When she arrived at the car dealership, however, Ms.

Cortez was in for a rude surprise.

After picking out the car she liked, Ms. Cortez applied for financing

and gave Elway Subaru permission to access her credit report in order to

determine what kind of loan she would qualify for.    (A 82-83).    Instead of

coming back with a loan approval, however, the Elway Subaru finance

manager, Tyler Sullivan, came back to Ms. Cortez with a flurry of

accusatory questions about where she was born and whether she was

Columbian.    (A 83).    Ms. Cortez testified as follows:

> The finance manager came in and started asking
> me questions about if I had always lived in the
> United States, if I had ever lived outside of the
> country, and asking these really strange questions.

4

> And I asked him I don't know what you're talking
> about, what is going on, and he showed me my
> credit report, and on it it had all of these OFAC
> Alerts, Hawk alerts telling me that I am a criminal
> and that he wanted to know if -- asking me this
> information about what it had said on there.

(A 83).

There Ms. Cortez learned that her TU credit report was the problem.

(A 84).  The very middle of the first page of her TU credit report had

multiple "OFAC Alerts" on it stating that her name was a "match" to a

person on the OFAC database.  (A 84); (*See also* A 526-527).  She learned

that the OFAC Alerts meant that her name (according to TU) was on the

U.S. Government's list of known terrorists, drug-traffickers and money

launderers.  (A 89).  In fact, her name was never on the OFAC list.   (*See* A

585-805).

Ms. Cortez was told by the Elway Subaru finance manager, who had

her keys in his possession, that due to the OFAC Alerts the FBI would need

to be called and that she should stay put.  (A 84).  Tyler Sullivan of Elway

Subaru did not deny making that statement, but rather stated that he didn't

remember whether he did.  (A 475-477). [2]

---

[2]      Mr. Sullivan also testified that if an Elway Subaru customer was truly
a person on the OFAC list, he would not allow him/her to obtain financing
or walk away with a car. (A 489).  As to what specifically he would do, Mr.
Sullivan testified that he would need to consult his compliance manual,

Ms. Cortez just sat there *for hours* worried that the FBI would come to
arrest her with guns drawn. (A 84-85 & 92). Multiple employees of Elway
Subaru walked in and out of the room where she was detained, and multiple
employees advised her that they knew about the OFAC Alert on her TU
credit report. (A 86).

Eventually it started to snow and Ms. Cortez got light-headed. (A 84-
85). She demanded that Elway Subaru give her back her keys, although the
car dealership would not allow her to take the new car that she sought to
purchase. (A 84-85). She drove home and had something to eat, only to call
back and learn that someone at Elway Subaru had finally decided that she
was not a terrorist or criminal and that she could come back and obtain
financing for the new car. (A 85).

The entire Elway Subaru ordeal lasted approximately six and a half
hours. (A 81-85). (*See also* A 528). Ms. Cortez testified at trial that she
was embarrassed, humiliated and scared:

> I was really afraid. I took this guy to his word, I
> thought he was going to call the FBI. I just sat

---

which at the same time he said he was familiar with but also that he did not
remember the procedure at issue. (A 490-491, 494-495 & 503-505).
Importantly, Mr. Sullivan, TU's witness, testified that he had several
conversations with TU's counsel and that after several lawyers all reviewed
an affidavit for him, he signed it. (A 497-503). At his trial testimony (via
deposition) Mr. Sullivan was forced to admit that many of those statements
in the sworn affidavit were false. (A 500-502 & 505).

there waiting.  I thought that's probably what was taking so long, that they were going to come down and they were going to interrogate me for some reason to try and figure out if I was this person or not, and I didn't know what to do. I just sat there just scared and frustrated.

(A 92).

**B.      TU's Repeated Failures To Disclose The Truth To Ms. Cortez That It Was Reporting Her As An OFAC Criminal, And TU's Refusal To Investigate Ms. Cortez's Disputes**

The very next day, March 31, 2005, Ms. Cortez called TU to find out how a thing like this could have happened.  (A 93).  The TU employee on the telephone misrepresented to her that TU was not reporting any OFAC history about her on her credit report.  (A 93).  Ms. Cortez was astonished because the day before, prior to leaving the dealership, she obtained a copy from Elway Subaru of her TU credit report, the one with offending OFAC Alerts on it that had caused all of the problems.  (A 88).  (*See also* A 526-527).

Ms. Cortez followed up with a letter to the TU customer service representative that she had spoken with, Anne Cooper, as well as Ms. Cooper's manager.  (A 94-95).  (*See also* A 528).  She enclosed a copy of the TU credit report from Elway Subaru that included the OFAC Alerts.  (*Id.*).  TU never investigated, and never responded to either Ms. Cortez's telephone dispute or her first written dispute.  (A 95, 199, 203 & 205).

7

Ms. Cortez followed up with another written dispute, again enclosing the problematic credit report with the OFAC Alerts on it. (A 95-96). Again, TU did not investigate this dispute. (A 97-98, 199, 203 & 205). Instead, on April 18, 2005, TU wrote a letter to Ms. Cortez explaining that, despite a telephone call and two previous letters, it did not understand what the problem was. (A 99). (*See also* A 537-538) (see "dispute status" section).

Ms. Cortez wrote a third letter on April 24, 2005. (A 99-100). Again she set out her dispute in detail and included a copy of the Elway Subaru credit report with the false OFAC Alerts information on it. (A 100-101). (*See also* A 539-544). Again, TU conducted no investigation. (A 101, 199-203 & 205).

This time, however, TU sent Ms. Cortez a letter falsely stating that there were no OFAC Alerts on her credit report. (A 101). (*See also* A 545). Specifically, TU's May 10, 2005 letter stated "Dispute Status – No Hawk Alerts or OFAC Advisor Alerts . . . Based on the information provided to TransUnion, our records show that the information you disputed does not currently appear on your TransUnion credit report." (A 545).

Hoping that the problem was solved, Ms. Cortez returned to Elway Subaru on June 3, 2005. (A 102). When Elway Subaru pulled Ms. Cortez's

8

credit report again, it was evident the TU had done nothing and that it had misled her all along: The OFAC Alerts stating that she was a match to the OFAC list were still there. (A 103). (*See also* A 546-548).

TU admits that the personal credit reports which consumers like Ms. Cortez receive, which are sent to their homes upon request, do not contain the OFAC Alerts information that TU sells to third parties. (A 157). Indeed, TU sent several personal credit reports to Plaintiff's home following some of her correspondence in April of 2005. (A 80-81 & 205). (*See also* A 552-567). None of those reports included any reference to OFAC, and none listed the OFAC Alerts that TU had been providing to third parties such as Elway Subaru. (A 157).

At trial, Trans Union's Group Manager of Consumer Relations, Eileen Little, admitted that TU did not investigate any of Ms. Cortez's disputes concerning the OFAC Alerts, even though it had a record that it received four disputes in 2005. (A 199-203, 205, 207 & 209).

Ms. Little explained that as a matter of policy TU never investigates consumer disputes about OFAC Alerts on their credit reports. (A 201-203). Ms. Little did acknowledge that TU is charged by the FCRA to investigate consumer disputes, and reportedly does so in other instances, including in

9

instances where a consumer disputes the accuracy of a public or government record on his or her credit report.[3]

## C.    TU's Refusal To Even Recognize -- Or Note -- Ms. Cortez's Dispute In Subsequent Reports

None of the personal credit reports that TU sent to Plaintiff's home indicated that Ms. Cortez disputed that OFAC Alert on her credit report. (A 205). (*See, e.g.,* A 552-567).    Similarly, none of the TU credit reports that TU subsequently sold to third parties noted Ms. Cortez's dispute.    For example, the June 3, 2005, TU credit report obtained by Elway Subaru included the OFAC Alerts which TU had told Ms. Cortez were not there, but did not note Ms. Cortez's dispute in any way. (*See* A 546-548).  Similarly, when she applied for a new apartment lease, her new landlord pulled her credit report as part of the approval process and it had OFAC alerts on it. (A 110-111). (*See also* A 549-551).    To her great embarrassment, Ms. Cortez needed to explain to the apartment complex manager that TU had mixed her up with a criminal and that the OFAC Alerts on her credit report did not really mean that she was the person on the government's wanted list, even though the TU report stated that she was a "match" to that list. (A 112).

---

[3]        TU routinely includes public record information on consumer credit reports, including records such as judgments and bankruptcies. (A 199-200).

### D.    Continuing Defamation, Anxiety And Worry

At trial, Ms. Cortez explained that, naturally, she was frustrated and anxious about the fact that TU's agents were telling her that the OFAC Alert was not on her report, when Ms. Cortez had seen it herself. (A 98-99). She was also very upset that TU had not addressed her disputes, and worried that the OFAC Alert mistake on her TU credit report would never get corrected. (A 78-79). Ms. Cortez testified as follows:

> I felt like they were just blowing me off, that they didn't care, they weren't interested in helping me solve the situation. They were just interested in denying it even existed.

(A 98-99).

Ms. Cortez is a single person in her 60s who lives by herself far away from her children. (A 142). She needs to use her credit in order to finance the purchase of a car and rent an apartment, among other ordinary transactions. (A 79-80 & 110). Knowing what TU was reporting about her and her frightening and real (not imaginary as TU suggests) experience at Elway Subaru, she feared that the OFAC Alert may get her detained, arrested, or worse. (A 92).[4]

---

[4]    Ms. Cortez's daughter, Anna Schen, testified at trial that her mother called her twice on the day she found out about the OFAC Alert and has seriously worried about this problem ever since. (A 141). The OFAC Alert is the "number one stress[or]" in Ms. Cortez's life. (A 143-144). It comes

11

For approximately two years, Ms. Cortez felt defamed and embarrassed to be associated with a criminal on the OFAC list, because she has never <u>had</u> a criminal record, and should not have to justify to any third party that she is not the Columbian drug-trafficker Sandra Cortes Quintero. (A 112).

### E.    TU's Policy Determinations Concerning OFAC Alerts And Its Conscious Refusal To Investigate Disputes

TU credit reports typically include four sections: first, a section of personal identifying information; second, a section of public and government records; third, a section of credit accounts and loans ("tradelines," as they are referred to in the industry); and fourth, a list of "inquiries," identifying persons and businesses to whom TU sold a report about that consumer. (A 165-166). Although TU insists the OFAC Alerts are not government or public records, they are included within TU credit reports in the second section, where public records are usually included (*i.e.* between the personal identifying information and tradelines). (A 156). Unlike other public record information, or any other type of information that TU includes in consumer credit reports, TU made a decision to treat OFAC Alerts differently in several key respects. (A 169-171).

---

up all the time, at family gatherings, in e-mails, at the airport. (A 141-143). Ms. Cortez has cried over this problem, lost sleep, and has resorted to taking sleeping pills. (A 142).

First, TU decided that it would not accept disputes about OFAC Alerts on its credit reports. (A 201, 205). TU, as a matter of policy, decided that it would not investigate disputes about the OFAC Alerts. (A 210, 203). Rather, it would allegedly tell customers with disputes to take up their problem with the Department of the Treasury.[5] (A 211).

Second, TU determined as a matter of policy and practice that it would not include any information about OFAC Alerts to consumers in their personal credit reports. (A 157). The evidence of record is that every time Ms. Cortez requested a copy of her credit report (or consumer file disclosure, as TU calls it) she was provided with a document called a "personal credit report," which did not state a word about OFAC, the name Sandra Cortes Quintero, or that Plaintiff's name was allegedly a "match" to a name on the OFAC database. (A 115 & 157). (*See, e.g.,* A 552-567).[6]

---

[5]    Despite this alleged policy of referring consumer to the Department of the Treasury, the evidence of record is that Ms. Cortez was never referred to the Department of the Treasury either in writing or over the telephone by TU. (A 211). But, such a referral would not have been helpful in any event. The Department of the Treasury did not have Plaintiff Sandra Cortez identified as a person on the OFAC list. Nor was Plaintiff interested in removing the name Sandra Cortes Quintero from the OFAC list. Her problem was that TU had mixed her name with that of Sandra Cortes Quintero. The government's record was not inaccurate.

[6]    Ironically, criminals who are actually on the OFAC list would be advised of it because the OFAC list is a public record and accessible on the Internet among other places. (A 104). Innocent Americans such as Plaintiff,

13

Third, TU decided that it would not put in place or follow any procedures to assure that the "match" between a consumer such as Plaintiff and the name of a criminal on the OFAC list was truly an accurate match. (A 175-180). TU itself would not check whether the names of consumers applying for credit actually matched letter-for-letter the names of criminals on that list. (A 175-180). Moreover, TU would not use any other information that the government makes available about persons on the OFAC list in order to determine whether it is mixing criminal alert data into the credit reports of innocent consumers. (A 175-180).

For example, in the case of Sandra Cortes Quintero, the OFAC list provided by the government has the criminal's full name, her date of birth, her country of origin, passport number, and other identifying information. (A 180-182). (*See* A 585-805). In identifying Plaintiff as the person on the OFAC list, TU did not filter or analyze any of that information. (A 175-176). Importantly, even though TU's own records indicated that Plaintiff was born in 1944, and the OFAC records that TU imported into Plaintiff's credit report stated on their face that Sandra Cortes Quintero was born in 1971, TU did not use the date of birth discrepancy to eliminate Plaintiff as a

---

who are not on the OFAC list, are not told by TU that reports sold by TU to third parties include OFAC Alerts identifying them as a "match" to the OFAC list. (A 115-117).

criminal. (A 176-177). Nor did TU accurately use Plaintiff's last name (Cortez, with a "z"), her middle name ("Jean"), her addresses, or *anything* to compare Plaintiff's personal identifying information with that of the criminal before it decided to identify Plaintiff as a "match" to the OFAC list. (A 175-181).

Indeed, presumably in an effort to avoid FCRA liability, TU even deliberately decided to keep OFAC data off site at the database of its business partner Accuity. (A 167-171 & 215). TU representatives testified at trial that TU consciously decided not to bring the OFAC data into the CRONUS database, where TU keeps most of its consumer information, for fear that bringing the OFAC data into CRONUS would require TU to undertake some FCRA due diligence to assure the accuracy of the information that it was selling about consumers. (A 168-171).

Plaintiff's expert, Mr. Evan Hendricks, opined that TU's procedures concerning the reporting of OFAC data "guarantee inaccuracy." (A 232-233). Mr. Hendricks, who has over twenty-five years of experience in the credit reporting industry, explained that the principal standard in the CRAs is that of "maximum possible accuracy." (A 225-226). Mr. Hendricks explained that the threshold determination that a CRA such as TU must undertake is to make sure that it is identifying information about the

15

consumer for whom the report is prepared. (A 241). For example, in

preparing a report on Plaintiff, TU is required to assure that the information

pertains to Sandra Jean Cortez of Centennial, Colorado (Highland Ranch,

Colorado at the time of the filing of the Complaint) born in May 1944,

having a certain social security number, and other personal identifiers. (A

229). The FCRA does not permit a consumer reporting agency like TU to

create a report about Plaintiff by including information about every single

person in the county named "Sandra Cortez," regardless of age, address,

social security number, and other factors. (A 229-230).

Yet, in preparing credit reports with criminal OFAC Alerts on them,

TU did not even assure that the name was a match. (A 230-231). As TU's

representative Colleen Gill admitted, and Mr. Hendricks further explained,

TU's procedures (or lack thereof) operate in such a way as to identify every

single Sandra Cortez in the United States as a match to the Columbian drug-

dealer Sandra Cortes Quintero. (A 184 & 227-229).[7]

Mr. Hendricks further explained that the OFAC list contained some

very popular and common names, such as Charles Taylor. (A 230). The list

---

[7]    Of course, these credit reports are sold within the United States about
innocent Americans whose names do not appear on the OFAC list. Thus
every Sandra Cortez in the United States has a criminal OFAC Alert on her
TU credit report so long as Sandra Cortes Quintero continues to be identified
by the U.S. Government as a known drug-trafficker on the OFAC list. (*Id*.).

also includes very common Hispanic, Asian, and Arabic names. (A 230). (*See also* A 585-805). TU's failure to use any procedures to "cross-match" the identity of persons truly on the OFAC list with the identity of innocent Americans about whom it is selling credit reports guarantees that inaccurate OFAC Alerts will be placed on the reports of consumers who are not on the OFAC list. (A 235-236 & 247).

### F.   TU Misleadingly Blames The Government For Its Error

Contrary to TU's argument at trial, the U.S. government has never had Ms. Cortez on the OFAC list; nor have other CRAs or anybody else, to Ms. Cortez's knowledge. The facts at trial were clear: The government OFAC list does not include Plaintiff's name, or any personal identifying information that is Plaintiff's. (A 104-105 & 585-805). Neither the government nor the law requires TU to sell any version of the OFAC list, whether inaccurate or accurate. (A 106-107). The government has no role in deciding whether OFAC criminal Alerts will be placed on Plaintiff's credit reports, the reports of any other Sandra Cortez in the United States, or the report of any American. (A 106-107 & 146-149). The government did not mis-identify Plaintiff as someone who is on the OFAC list. (A 104 & 144-147).

The evidence at trial also established that TU rolled out the OFAC Alert as another credit reporting "product" that it sold for an additional fee. (A 149). TU is the entity which is entirely responsible for placing an OFAC Alert on a consumer's credit report. (A 149-152). TU profits from this sale of information as well. (A 163-164). The OFAC Alerts sold by TU uniformly appear in the middle of a full credit report that is sold to third parties in connection with applications for credit, employment, or insurance. (A 162-163). It was TU's decision to use a "name only" matching logic which would allegedly match names of known criminals on the OFAC list with the names of persons applying for credit, insurance, or employment. (A 175-176). It was TU that exclusively identified Plaintiff as a match to a person on the OFAC list named Sandra Cortes Quintero. (A 107-108). TU's commercial practices alone are the sole cause for the misidentification of dozens of innocent Americans named Sandra Cortez as wanted Columbian drug dealers. (A 181-185).[8]

---

[8]    Further, It is TU's practices and policies that would identify every Charles Taylor applying for credit, insurance, or employment in this country as a "match" to the former president of Liberia, whom the U.S. Government has placed on the OFAC list. (A 230). It is TU that refuses to disclose the truth to consumers concerning what it is reporting about them and to investigate consumer disputes. (A 157 & 205).

18

## G.    TU's Long-Standing "Mixed File" Problem And Conscious Disregard Of Consumer Rights

The type of mix that occurred between Plaintiff and one Sandra Cortes Quintero is neither uncommon nor unknown to TU.  (A 227).  It is a problem of mixing the information of one consumer into the file of another consumer who shares some similarities, usually his or her name.  This phenomenon is known as a "mixed file."  (A 224-225).

TU has had a mixed file problem for many years, and Ms. Cortez was simply another victim in a long line.  (A 244-245).  Plaintiff's expert, Mr. Hendricks, testified at trial that for many years mixed files were the leading cause of complaints against consumer reporting agencies to the Federal Trade Commission.  (A 227-230 & 245).  The industry was forced to develop strict "cross-matching" criteria to assure that it was not mixing up the files of fathers and sons, mothers and daughters, and people with similar common names.  (A 229).  TU knows how to cross-match personal identifiers such as name, social security number, date of birth, and street address, and the importance of such a process.  (A 235-236).  If it had taken care to implement some type of reasonable cross-matching procedure in integrating the OFAC Alert data into its credit reports, it would not have identified Plaintiff as a match to Sandra Cortes Quintero.  (A 230-233).  But despite its knowledge of the mixed file problem, and of cross-matching, TU

took no precautions to prevent a mixed file between Plaintiff and Sandra Cortes Quintero. (A 232-233).

Even after Ms. Cortez put TU on notice that it was "mixing" her with someone else, TU did nothing. (A 98-99) (*See* A 528-531) ("You obviously have someone's else's name mixed up with my file"). There is no evidence that TU implemented any procedures after March 31, 2005 to correct the mixed file between Plaintiff and Sandra Cortes Quintero. (A 182-184). Indeed, as late as Ms. Gills' deposition in September 2006, TU maintained that there was no way to fix Plaintiff's problem and that it could not block the OFAC Alerts from appearing on Ms. Cortez's TU credit reports. (A 183-184).

At trial Ms. Gill surprisingly testified that TU had discovered some procedure to un-mix Plaintiff Sandra Cortez from the OFAC Alert belonging to Sandra Cortes Quintero. (A 184). TU, however, never showed that it fixed the problem, never offered any evidence of a "block," and never provided any credit report that reportedly showed the correction. (A 114-115, 182-183 & 184-186). The jury's verdict suggests that it was not persuaded by Ms. Gill's testimony. (A 812).

20

### H.    The Jury's Punitive Damages Award Is Less Than 1/10 Of 1% Of TU's Net Worth

TU's profits derive from the sale of credit information (including OFAC Alerts) about consumers to third parties. (A 163-164). For purposes of the punitive damages portion of the case, the parties stipulated that Plaintiff could present to the jury TU's net worth for 2005 – which was $939,000,000. (A 439).[9] The jury's $750,000 punitive damages award is less than one-tenth of 1% of TU's net worth for 2005.

### VI.    PROCEDURAL BACKGROUND

After the verdict, TU filed a post-trial motion seeking three alternative forms of relief: (1) judgment in its favor; (2) a new trial; or (3) remittitur. (*See* A 823-829, Slip. Op. at 2) ("The defendant has filed motions for judgment as a matter of law, or a new trial, or remittitur") (emphasis added).

TU never sought a new trial on the basis of an excessive verdict or a new trial only as to damages. The only two arguments that TU actually made to the trial court in support of its motion for a new trial were that TU was allegedly prejudiced by the submission of Ms. Cortez's "consumer statement" claim to the jury and Ms. Cortez's counsel allegedly made an improper "unit of time" argument to the jury during closing arguments. TU

---

[9]    This was represented by TU as being the most recent net worth figure available.

moved for remittitur not as a basis for a new trial, but as an "alternative" form for relief.

In its September 13, 2007 Memorandum and Order the trial court denied TU's motion for judgment as a matter of law and also expressly denied motion for a new trial. (*See* A 829 at pars. 1 and 2). Nevertheless, without any notice or an opportunity for Ms. Cortez to be heard, the trial court on its own determined that a new trial as to damages was warranted "unless" Ms. Cortez accepted a remitted punitive damages award of $100,000, instead of $750,000, finding in one sentence without explanation that $100,000 was the "permissible limit." (*See* A 823-829, Slip. Op. at 5). The trial court, also without any proper explanation, further cut Ms. Cortez's counsel fees and costs from the approximately $199,000 sought to $132,000, and also made the reduced fee award contingent upon Ms. Cortez's acceptance of the remittitur within 30 days. (*Id*. at 5-6).

Since the trial court had decided the limits of any recovery in her case, it stands to reason that a new trial on damages before the trial court and a new jury would be futile.[10]   The trial court's order makes it clear that it

---

[10]   Presumably, any award following a new trial would be restrained by the same limits that the trial court believes apply to this case. Moreover, this case was driven by punitive damages and TU's reprehensible conduct as to liability. Depending on how much and what type of evidence as to liability would be admitted by Judge Fullam in a new trial on damages, Ms. Cortez

22

would not permit Ms. Cortez to recover any more than $150,000 total even if a new jury came back with a much higher award. She thus conditionally accepted the remittitur on October 12, 2007. The conditional acceptance expressly provides that "In the event that the District Court was acting properly within its power and jurisdiction in entering its Order of September 13, 2007, which is a subject of Plaintiff's Notice of Appeal (E.D. Pa. Docket No. 70), *see., e.g., Demeretz v. Daniels Motor Freight, Inc.,* 307 F.2d 469 (3d Cir. 1962), Plaintiff hereby accepts the remittitur." (*See* E.D. Pa. Docket No. 71). Immediately before conditionally accepting the remittitur, Ms. Cortez filed an appeal on October 12, 2007.

The trial court took no further action. Then the Third Circuit dismissed the October 2007 appeal for lack of jurisdiction, stating that "[a]n order granting a new trial is purely interlocutory and is not an appealable final order." (E. D. Pa. Docket No. 74). This Court did not dismiss the October appeal because Ms. Cortez had conditionally accepted the remittitur.

Thereafter, on April 24, 2008, the parties had a short telephone hearing to discuss TU's motion to have a judgment entered for the remitted amount, instead of a new trial. (E.D. Pa. Docket Nos. 76 & 77). On May 1,

may very well not have the same opportunity to present her case to the jury as to punitive damages.

23

2008, Judge Fullam issued another order entering judgment against TU for $282,000, representing Plaintiff's actual damages as well as the remitted punitive damages and remitted counsel fees. Plaintiff filed this appeal on May 16, 2008. TU had also appealed earlier on the same day.

## VII.  ARGUMENT

### A.    Summary Of Argument

Federal Rule of Civil Procedure 59(d) and Third Circuit precedent urges that the trial court's decision be reversed and that the jury verdict be reinstated. Fed. R. Civ. P. 59(d); *Demeretz v. Daniels Motor Freight, Inc.*, 307 F.2d 469 (3d Cir. 1962). The trial court here overstepped its power when it ordered on September 13, 2007 a partial new trial on a basis not requested by TU, or anybody, without providing Ms. Cortez with a hearing or an opportunity to be heard, and further fashioned its unjustified conditional order of the same day in such a way as to preclude meaningful appellate review.

### B.    Argument

Both this and other Courts of Appeal have found that "[a] motion for a new trial must state the grounds upon which relief is sought and it raises no issues other than those covered by the stated grounds for relief." *Demeretz*,

24

307 F.2d at 472.[11]   Moreover, it is black letter law that issues not preserved

and raised by a party in a motion for a new trial are deemed waived. *Berger*

*v. Colon*, 215 F.3d 1311 (1st Cir. 2000). Although a trial court may grant a

new trial on a basis different than that raised by the moving party, it must

either do so within *10 days* of the judgment or else provide the prevailing

party with notice and an opportunity to be heard on that new basis, and then

explain its reasons with specificity. Fed. R. Civ. P. 59(d). The trial court

here simply did not follow any of these precepts, to Ms. Cortez's detriment.

In this case, TU did not move for or seek a partial new trial as to

damages only. [12]  TU clearly moved for an entirely new trial for liability

reasons, not the size of the award. The trial court ruled on an issue not

---

[11]    *See also Kelly v. Moore*, 376 F.3d 481, 484 (5th Cir. 2004) (moving
party who sought new trial on liability or remittitur did not raise legal theory
actually relied upon by trial court in remitting award, and thus court did not
rule under Rule 59(b), but instead ruled on its own initiative under Rule
59(d)) (ultimately dismissing appeal for lack of jurisdiction)); *Snellman v.
Ricoh Co., Ltd.*, 836 F.2d 528, 532 (C.A. Fed. 1987) (agreeing with district
court's rejection of the argument that a motion for new trial on "all issues"
constituted a specific request for the relief of a new trial since "a catchall
phrase cannot serve as a cure-all for failure to set forth in a Rule 59 motion
the relief sought").

[12]    This Court has observed that partial new trials can be frowned upon
and has found that where the issues of liability and damages are closely
interwoven, a new trial as to damages only may not be appropriate. *See
Vizzini v. Ford Motor Co.*, 569, F.2d 754, 759-62 (3d Cir. 1977) (citing
*Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494 (1931) and
other cases).

before it when it ordered a new trial as to damages only. In that respect, it overstepped its authority in a similar fashion to the trial court in *Demeretz.*

In *Demeretz*, this Court found that when the trial court exceeds its power in ordering a new trial, the jury verdict should be reinstated. *Demeretz*, 307 F.2d at 471 (relying upon *Phillips v. Negley*, 1886, 117 U.S. 665, 6 S.Ct. 901, 29 L.Ed. 1013 (1886)). *Demeretz* involved a situation where the trial court issued a conditional order, advising the plaintiff who had prevailed at trial that unless she accepted a remitted award she would have to have a new trial as to damages. *Demeretz*, 307 F.2d at 471. The defendant had never expressly moved for a new trial as to damages, or due to the size of the award, but had moved for a new trial on other grounds. *Id.* Moreover, the trial court itself had not within 10 days after the entry of judgment ordered a new trial as to damages. *Id.* at 472.

The Third Circuit found that the trial court acted beyond its power in granting a new trial on grounds that had not been expressly raised by the defendant. *Id.* at 472 ("[a] motion for a new trial must state the grounds upon which relief is sought and it raises no issues other than those covered by the stated grounds for relief"). This Court noted that the trial court has the power to issue a new trial on other grounds on its own initiative, but such a new trial must be ordered within 10 days of the entry of the judgment, not

any later, per Fed. R. Civ. P. 59(d). *Id.* Because the trial court had not acted

on its own initiative within 10 days, nor in direct response to a request for a

new trial actually raised by the defendant in that case, the Third Circuit

found that the trial court had no power to issue a new trial order. It thus

vacated that order and reinstated the judgment based upon the jury's verdict.

*Id.* at 473.

Although Rule 59(d) has been amended since *Demeretz*, the trial court

is still restrained from acting on its own initiative to grant a new trial more

than 10 days after the entry of judgment *unless* it gives the "parties notice

and an opportunity to be heard" *and also* "specif[ies] the reasons in its

order." Fed. R. Civ. P. 59(d) (1966 amendments).

In a post-amendment decision, the Tenth Circuit found as follows:

> The inescapable fact is that the court below,
> entirely on its own initiative and approximately
> four months after it had entered judgment on the
> plaintiff's verdict, saw fit without notice and
> hearing to alter that judgment by eliminating
> therefrom the jury's award of punitive damages.
> We can find no sanction for this action in the
> Federal Rules of Civil Procedure.

*Dow v. Baird*, 389 F.2d 882, 884 (10th Cir. 1968) (setting aside remittitur

made on trial court's own initiative without notice or hearing).[13]

---

[13]     *See also Kelly v. Moore*, 376 F.3d 481, 484-85 (5th Cir. 2004) (noting
that under Rule 59(d) trial court must give plaintiff notice and the

Similarly, in the case at bar, the trial court acted beyond its power, even under the current version of Rule 59(d). The trial court entered judgment for Ms. Cortez based upon the jury's verdict on April 30, 2007. (*See* A 822). The trial court took no action to order a new trial within 10 days of that entry of judgment. TU's post-trial motion sought a new trial, but *not* as to the alleged excessiveness of the damages award. TU's motion identified three discrete issues on which it sought a new trial, none challenging the size of the compensatory or punitive damages awards. (*See* E.D. Pa. Docket No. 50 at pg. 4).[14]   Only two of those three issues were actually briefed.[15]   (*See* E.D. Pa. Docket No. 58 at ppg. 20-24).

---

opportunity to be heard before remitting jury award on its own legal theory not raised by defendant, but ultimately finding that it lacked jurisdiction to hear appeal because no final order had been entered in that case).

[14]   TU identified  the new trial issues specifically as follows:  (A) "The Court Erred as a matter of law in determining that plaintiff's disputes also triggered her right to a consumer statement as defined by FCRA"; (B) "The Court Erred by instructing the jury and issuing a Verdict Form which allowed the jury to find that Trans Union violated § 1681i(b) or (c) because there was no evidence to support such a claim"; and (C) "Plaintiff Was Allowed to Present an Improper 'Unit of Time' Argument to the Jury Without a Curative Instruction."

[15]   TU briefed only the following two issues in support of its motion for a new trial:  (A) "Trans Union Was Prejudiced by the Erroneous Submission of Plaintiff's 'Consumer Statement' Claim to the Jury"; and (B) "Trans Union Was Prejudiced by Counsel's Improper 'Unit of Time' Argument to the Jury and by the Court's Refusal to Give a Curative Instruction."

On September 13, 2007, the trial court here expressly *denied* the Defendant's motion for a new trial. (*See* A 829 at par. 2). The trial court nevertheless, and without providing the parties with notice and an opportunity to be heard, granted a "new trial" as to "damages" only "unless" Ms. Cortez accepted the trial court's remittitur. (*See* A 829 at par. 3). In so doing, the trial court here acted outside of the scope of its power and in violation of Rule 59(d).

A hearing on this issue would not have been formulaic. Ms. Cortez, and even TU, could have presented solid reasons against a partial new trial. Importantly, Ms. Cortez would have been afforded an opportunity to establish a record, which could be reviewed on appeal (unlike the present situation), as to why the punitive damages award should not have been remitted and why a new trial on punitive damages was not appropriate.

The fact that Ms. Cortez conditionally accepted the remittitur does not change the above analysis or conclusion. If the trial court's September 13 order was invalid, the order must be vacated and Ms. Cortez should not, and cannot, be bound by it. In conditionally accepting the remittitur, Ms. Cortez simply recognized the practical reality that this trial court would not permit her to recover a higher award as it had already decided the limits of her case. Thus, if the trial court was acting within the scope of its power, Ms. Cortez

29

does not wish to have, and sees no point in having, a new trial on damages. By the same token, if the trial court was not acting within it power, Ms. Cortez asserts that the law should not require her to accept an otherwise invalid order.

This appeal should not be governed by the rule announced in *Donovan v. Penn Shipping Co., Inc.*, 429 U.S. 648, 650 (1977), which held that a plaintiff that accepts a remittitur cannot challenge it on appeal. Ms. Cortez here does not seek to challenge the remittitur on the merits. She does not, for example, argue that the jury's punitive damages ratio hit the correct constitutional balance under a due process analysis, or that the trial court reduced the punitive damages award by more than it should have under the relevant precedents. Rather, Ms. Cortez seeks to collaterally challenge the trial court's authority in issuing its "conditional" order of September 13; not the merits of that order. *Donovan* is therefore not controlling.

Had the trial court ruled upon the issues actually before it, it is predictable, given its comments, that it would have remitted Ms. Cortez's punitive damages award anyway, as TU had requested that it do "in the alternative." (*See* E.D. Pa. Docket No. 50 at 5, and E.D. Pa. Docket No. 58 at 24-31). There is no dispute that TU sought remittitur. It just did not seek a "new trial" on "damages," compensatory or punitive. Not a line of TU's

motion or its 33 page post-trial memorandum seeks such relief on remittitur grounds.

Of course, had the trial court actually ruled upon TU's motion as presented by TU, the (presumably) remitted award would have eventually become a final order and then Mr. Cortez could have appealed the merits of that order. *See CGB Occupational Therapy, Inc. v. RHA Health Services*, 499 F.3d 184, 188 (3d Cir. 2007) (cross appeals from final order remitting punitive damages award, without conditional new trial having been offered); (*See Id.* at E.D. Pa. Docket Nos. 232, 233 and 237) (remittitur granted without conditional new trial and appealed by both parties); *Farrber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1395 (6ᵗʰ Cir. 1990) (remittitur award appealed by plaintiff after award was remitted by trial court without order of new trial); *O'Gilvie v. International Playtex, Inc.*, 821 F.2d 1438, 1447 (10ᵗʰ Cir. 1987) (remittitur of award without order of new trial was appropriately taken by plaintiff).

But the trial court here saw to it that the September 13 order was conditional and interlocutory in nature, inviting Ms. Cortez for a new trial on damages, which Ms. Cortez did not seek, which TU did not move for, and which practically would have been futile given the trial court's view as to the "limits" of Ms. Cortez's case.

31

For the reasons stated above, the September 13, 2007 order should be vacated and the judgment of April 30, 2007, which was based upon the jury's verdict, should be reinstated.

At a minimum, this Court should remand the matter to the trial court with directions to rule upon the portion of TU's motion that it did not rule upon -- namely, TU's request for remittitur of the punitive damages award, *without* a new trial on damages. Once that remittitur decision is made and becomes final, Ms. Cortez would at least have the opportunity to meaningfully appeal the merits of the trial court's order. If the trial court's decision of September 13, 2007 is allowed to stand as is, it would effectively preclude parties such as Ms. Cortez from any meaningful review.

Finally, this Court should vacate the reduced counsel fees and costs award and order the trial court to provide a proper and detailed analysis for any reduction for counsel's time which was specifically challenged by TU. *See Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cr. 1990). Ms. Cortez believes that her counsel submitted a proper and detailed fee petition following an action vigorously contested by TU at every turn. TU objected to certain portions of the fee petition. The trial court improperly reduced counsel's fee petition without any proper explanation and further improperly made the reduced counsel award conditional on Ms. Cortez's acceptance of

the remittiter.  Like its action concerning the remitted punitive damages

verdict, the trial court's action concerning Ms. Cortez's fee petition also

made meaningful appellate review impossible.

## VIII.    CONCLUSION

For the reasons discussed above, this Court should vacate the trial

court's remittitur order and reinstate the jury's verdict, and further direct the

trial court to properly consider Appellant/Cross-Appellee's fee petition.

> Respectfully submitted,
> **FRANCIS & MAILMAN, P.C.**

> BY:    _/s/ John Soumilas_
> JAMES A. FRANCIS
> JOHN SOUMILAS
> Land Title Building, 19[th] Floor
> 100 South Broad Street
> Philadelphia, PA 19110
> (215) 735-8600

Dated: September 22, 2008

33

## **CERTIFICATION OF BAR MEMBERSHIP**

I, John Soumilas, Esquire hereby certify that I am a member in good

standing of the bar of the United States Court of Appeals for the Third

Circuit.

_/s/ John Soumilas_

JOHN SOUMILAS
Attorney for Appellant / Cross-
Appellee

Dated:  September 22, 2008

## **CERTIFICATION OF BAR MEMBERSHIP**

I, James A. Francis, Esquire hereby certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

*/s/ James A. Francis*
JAMES A. FRANCIS
Attorney for Appellant / Cross-Appellee

Dated: September 22, 2008

## **CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32**

1.      This brief complies with the type-volume limitations of Fed. R. App. 32(a)(7)(B) because this brief contains 6,823 words, excluding those parts of the brief excluded by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word Times New Roman 14.

_/s/ John Soumilas_
JOHN SOUMILAS
Attorney for Appellant / Cross-
Appellee

Dated:  September 22, 2008

## CERTIFICATE OF SERVICE

DOCKET NO. 08-2465 & 08-2466

------------------------------------------------------------------------------X

Cortez

     vs.

Trans Union, LLC

------------------------------------------------------------------------------X

       EDWARD T. O'CONNELL
       13 WILLIAM ST. APT. 2
       GARFIELD, NJ 07026

     I,               , swear under the pain and penalty of perjury, that according to law and being over the age of 18, upon my oath depose and say that:

     on September 22, 2008

     I served the **Brief and Appendix Volume I of III for Appellant** within in the above captioned matter upon:

Timothy P. Creech, Esq.
Mark E. Kogan, Esq.
Bruce S. Luckman, Esq.
Kogan, Trichon & Wertheimer, P.C.
1818 Market Street, 30th Floor
Philadelphia, PA 19103-0000
*Attorneys for Appellee/Cross Appellant Trans Union, LLC*

via **Express Mail** by depositing **2** copies of same, enclosed in a post-paid, properly addressed wrapper, in an official depository maintained by United States Postal Service.

Unless otherwise noted, copies have been sent to the court on the same date as above for filing via Express Mail.

**Sworn to before me on September 22, 2008**

Robyn Cocho
Notary Public State of New Jersey
No. 2193491
Commission Expires January 8, 2012

*Edward T O'Connell*

Job # 218286

## CERTIFICATE OF BRIEF TEXT

I, John Soumilas, Esquire, hereby certify that the text of the E-Brief and Hard Copies of the foregoing BRIEF OF APPELLANT / CROSS-APPELLEE are identical.

*/s/ John Soumilas*
JOHN SOUMILAS
Attorney for Appellant / Cross-Appellee

Dated:  September 22, 2008

38

## CERTIFICATION OF VIRUS CHECK

I, John Soumilas, Esquire, hereby certify that a virus check was performed on the PDF file of the foregoing BRIEF OF APPELLANT / CROSS-APPELLEE prior to electronic filing using Symantec AntiVirus 2005.

*/s/ John Soumilas*
JOHN SOUMILAS
Attorney for Appellant / Cross-Appellee

Dated:  September 22, 2008

# TABLE OF CONTENTS

**Page**

**VOLUME I:**

MEMORADUM AND JUDGMENT.................................................... A1

NOTICE OF APPEAL FILED BY TRANS UNION ........................... A3

NOTICE OF APPEAL FILED BY SANDRA CORTEZ ..................... A5


**VOLUME II**

DISTRICT COURT DOCKET ENTRIES ............................................ A7

COMPLAINT FILED OCTOBER 26, 2005 ......................................... A18

ANSWER TO COMPLAINT FILED NOVEMBER 29, 2005 .............. A29

NOTES OF TESTIMONY DATED APRIL 23, 2007........................... A34

NOTES OF TESTIMONY DATED APRIL 24, 2007........................... A195

NOTES OF TESTIMONY DATED APRIL 25, 2007........................... A333

DEPOSITION OF TYLER SULLIVAN ............................................... A456

    P-2: ...................................................................................... A526

    P-3: ...................................................................................... A528

    P-4: ...................................................................................... A532

    P-5: ...................................................................................... A537

    P-6: ...................................................................................... A540

    P-7: ...................................................................................... A545

    P-9: ...................................................................................... A546

    P-10: ..................................................................................... A549

    P-26: ..................................................................................... A552

P-32: ....................................................................... A568

P-33: ....................................................................... A569

P-34: ....................................................................... A580

P-39: ....................................................................... A582

P-41: ....................................................................... A585

P-48: ....................................................................... A806


JURY INTERROGATORIES ............................................... A810

VERDICT ........................................................... A812

NOTES OF TESTIMONY DATED APRIL 26, 2007 .......................... A813

ORDER DATED APRIL 30, 2007 ...................................... A822

MEMORANDUM AND ORDER DATED SEPTEMBER 13, 2007 .... A823

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Sandra Cortez                          :
                                       :          CIVIL ACTION
                    v.                 :
                                       :          NO. 05-5684
Trans Union, LLC                       :

## MEMORANDUM

_____Fair Credit Reporting Act case.  A jury trial was held and a verdict rendered in favor of the Plaintiff and against the Defendant, assessing $50,000 in actual damages, and $750,000.00 in punitive damages.

On September 13, 2007, I entered an order granting the Defendant's motion for a new trial with respect to damages, unless the Plaintiff accepted a remittitur limiting the award to $50,000 compensatory damages and $100,000 punitive damages, for a total award of $150,000.  On October 12, 2007 the Plaintiff filed a notice of appeal of this order, as well as a conditional acceptance of the remittitur.

On February 14, 2008, the Third Circuit dismissed the Plaintiff's appeal for lack of jurisdiction, finding that an appealable final order had not been entered.  The Defendant then moved for final judgment.  Because the Plaintiff accepted the remittitur, I will grant the Defendant's motion and enter judgment.  An order will enter.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Sandra Cortez

     CIVIL ACTION

   v.

     NO. 05-5684

Trans Union, LLC

<u>JUDGMENT ORDER</u>

AND NOW, this 1ˢᵗ day of May, 2008, upon consideration of the Defendant's Motion to Enter Final Judgment,

IT IS ORDERED that the motion is GRANTED.  Judgment is hereby ENTERED IN FAVOR OF Plaintiff Sandra Cortex and AGAINST Defendant Trans Union, LLC as follows:

   Damages:  $150,000

   Counsel Fees: $125,000

   Costs:   $7,000

   Total Judgment: $282,000

The Clerk is directed to close the file.

       BY THE COURT:

       /s/ John P. Fullam
       John P. Fullam, Sr  J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| SANDRA CORTEZ, )<br>)<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>TRANS UNION, LLC, )<br>)<br>Defendant. )<br>) | C.A. No: 2:05-cv-05684-JF |

**NOTICE OF APPEAL**

Notice is hereby given that Trans Union, LLC, Defendant in the above case, appeals to the United States Court of Appeals for the Third Circuit from the District Court's Memorandum and Judgment Order entered in this action on May 1, 2008 (E.D.Pa. Dkt# 77).

Respectfully Submitted,

KOGAN, TRICHON & WERTHEIMER, P.C.

*/s/ Bruce S. Luckman*
MARK E. KOGAN
BRUCE S. LUCKMAN
TIMOTHY P. CREECH
1818 Market Street, 30th Floor
Philadelphia, PA 19103
(215) 575-7600; Fax: (215) 575-7688
mkogan@mstkw.com; bluckman@mstkw.com

DATED:    May 16, 2008

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SANDRA CORTEZ )<br><br>Plaintiff, )<br><br>v.          )<br><br>TRANS UNION, LLC )<br><br>Defendant. ) | C.A. No: 05-5684 |

**CERTIFICATE OF SERVICE**

BRUCE S. LUCKMAN, Esq., hereby certifies that he caused a true and correct copy of

the foregoing Trans Union LLC's Notice of Appeal to be sent on this date, *via* ECF Notification,

to the following:

James A. Francis, Esq.
John Soumilas, Esq.
FRANCIS & MAILMAN, PC
Land Title Bldg, 19th Floor
100 S. Broad Street
Philadelphia, PA 19110
215-735-8600; Fax: 215-940-8000
jfrancis@consumerlawfirm.com; jsoumilas@consumerlawfirm.com

*Counsel for Plaintiff*

*s/ Bruce S. Luckman*
BRUCE S. LUCKMAN

DATED:      May 16, 2008

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SANDRA CORTEZ** | ) |
| | ) |
| **Plaintiff,** | ) |
| **vs.** | ) |
| | ) |
| **TRANS UNION, LLC** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

Civil Action No.  05-5684

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Sandra Cortez, Plaintiff in the above case, appeals to the United States Court of Appeals for the Third Circuit from the District Court's Memorandum and Judgment Order entered in this action on May 1, 2008 (E.D. Pa. Docket No. 77), including all previous rulings made by the District Court in this matter.

Respectfully Submitted,

  /s/ John Soumilas
James A. Francis
John Soumilas
**FRANCIS & MAILMAN, P.C.**
Land Title Building, 19th Floor
100 S. Broad St.
Philadelphia, PA 19110
(215) 735-8600

Attorneys for Plaintiff

Dated:  May 16, 2008

A5

## CERTIFICATE OF SERVICE

I, John Soumilas, hereby certify that, on this date, I caused a true and correct copy of the foregoing Notice of Appeal to be served by way of ECF notification upon the following:

> Bruce S. Luckman, Esquire
> Kogan, Trichon, & Wertheimer, P.C.
> 1818 Market Street, 30th Floor
> Philadelphia, PA 19103
> bluckman@mstkw.com

**FRANCIS & MAILMAN, P.C.**

 /s/ John Soumilas
JOHN SOUMILAS
Attorney for Plaintiff
Land Title Building, 19th Floor
100 South Broad Street
Philadelphia, PA 19110
(215) 735-8600

DATE:  May 16, 2008